Good morning, Your Honors. My name is Hannah Warner, appearing on behalf of Plaintiff Appellants, Familias Unidas. I'd like to reserve five minutes for rebuttal, please. There are two main issues before the Court today. First, I'll address our client's appeal of the District Court's limited success ruling, and how the District Court abused its discretion there in two primary ways. Second, I'll address the Department's cross-appeal, and why this Court should affirm the District Court's ruling that the Department lacked substantial justification. Turning to the first issue, the District Court abused its discretion under Hensley in two ways. First, Hensley is clear that when the claims are all related, which no one disputes here, the District Court can't reduce the fee simply because the Court failed to reach certain claims. In other words, the Court can't cut the fee based on wins, losses, or mooted claims. What was the total amount of the recovery? The ultimate fee award was $100,000. No, I'm sorry, on the merits of the case, not the fee award. So, we were seeking injunctive relief, Your Honor, and so the net effect of that injunctive relief, there was no award for damages, but the net effect of that injunctive relief was that our clients succeeded in protecting millions of dollars in harvest wages over three consecutive years, and they also obtained three separate permanent changes to Department policy to ensure that farmworkers would receive higher market wages rather than the lower hourly wages that the Department was unlawfully certifying. Can you refine more than just saying millions? Certainly. If you can't, that's all right. Oh, no, certainly, Your Honor. So, this is in the record at 5ER1102 in the first preliminary injunction order where the District Court acknowledged that, quote, elimination of piece rate wages for apples would save employers millions of dollars, end quote. And this is also at FER121-23. And to put this in dollar figures in terms of worker pay, the Department repeatedly approved contracts that underpaid workers at a little over $16 per hour when the real-world market wages to harvest fruit in Washington were up to $24 per hour, and that $24 per hour figure is what is available at FER121-23. And that is a massive $8 per hour drop in pay, which has a huge impact on seasonal farmworkers where the amount of money they earn per harvest season is crucial to maintaining their livelihood throughout the year. In evaluating your level of success, I'm trying to figure out, should we be looking at the first two preliminary injunctions? It seems like we're supposed to look at the totality of the case, or should we mostly focus on this permanent final injunction, the results thereof that you're talking about? So, Your Honor is correct that the test under Hensley is to look at the scope of the overall relief obtained by the clients. And so I would say that the court shouldn't look at any of the individual stages or injunction motions as the district court incorrectly did and as the Department is arguing to do, because that is a litigation scorecard approach that is clearly disallowed under Hensley. Hensley rejects a sort of mathematical scorekeeping of the wins and losses of particular motions throughout the litigation. And I appreciate that, but I still kind of wanted to ask why, in your view, your second preliminary injunction was so maybe unsuccessful? I don't know if that's the right way to put it as compared to the first. So the second preliminary injunction, Your Honor, was our clients challenged the Department in issuing a new set of prevailing wage findings. And our clients were challenging them so they would not be published and put into effect, because those wage findings were even more disastrous than they had been when our clients achieved the first preliminary injunction order, because that next set of findings would have eliminated all of the higher market wages for harvesting fruit in Washington. And so our clients challenged that, but then the Department later abandoned those regulations and withdrew them. And so the net effect was the same as if we had won the second injunction. Those findings were never published, and the higher market wages that we had obtained earlier remained in place to protect farmworkers' wages. And so basically they were mooted by the actions of DOL? Essentially, yes. It was mooted by the Department's own actions in deciding not to publish their own wage findings. And it seems to me mooted in response to your lawsuit. I don't think they did it out of the goodness of their heart just because they woke up one morning and said, oh, I guess we made a mistake. I think it was your suit that prompted that. That is our view as well, Your Honor. It might have been moot, but it was mooted because of your lawsuit. That is also how we look at it, Your Honor. And under Hensley, the district court abused its discretion when it found that issues that became moot were then counted as losses by the district court. It did that for issues like the outcome of that second injunction, and it also did it for other claims in the case where the department issued new prevailing wage regulations in 2022, and the district court ruled that because of those new prevailing wage regulations, certain of our claims were dismissed as moot. But then the district court misapplied Hensley and abused its discretion by counting those mooted claims as losses, which Hensley clearly says should not be done because Hensley says the court's rejection of or failure to reach certain grounds is an insufficient basis for reducing the fee award. And Hensley goes on to say, and this is also supported by this court's en banc ruling in Ibrahim, that litigants have a duty to raise related alternative claims, and a full fee should be awarded when excellent results are obtained. When the claims are all related and there are excellent results, a full fee should be awarded. But that's not what the district court did. Instead, it incorrects you. You say that your conservative estimate of fees is $250,000. So how are you viewing your success to get to that number? So we provided some examples in our briefing of how the district court could have looked at the fee records in a way that would be in keeping with Hensley if this court were to find limited success. We don't think this is a limited success case. We think this is an excellent results case, which under Hensley and Ibrahim, when the claims are related and excellent results are achieved, the case law says a full fee should be awarded. Now, if this court were to find limited success, then we say the district court still got the math wrong. It still failed to, as Hensley instructs, reasonably relate the fee amount to the results obtained. But do we look at what you sought from the beginning? I mean, it seems like you were asking a lot in your first preliminary injunction request. So how is that evaluated? So the only request for a dollar amount was in the attorney's fee request because we were pursuing… No, I'm talking about the injunction relief that was sought initially. I'm not sure I'm following your question, Your Honor. What Judge Mendoza reviewed, how does that differ in terms of the claims or the requests that were made in that preliminary injunction from the ultimate permanent injunction that was granted? So Judge Mendoza, in the first preliminary injunction order, with that injunctive relief that our clients obtained, that prevented wage loss. So we weren't asking for a recovery of damages or wage recovery. We were seeking injunctive relief to prevent impending wage loss in that next harvest season. And so the amount, the first dollar amount that we requested was in the attorney's fees petition in order to recover fees for hours that we reasonably expended due to the successes, the excellent results over the course of litigation. And so to further answer your question, Judge Koh, we gave certain of those examples in the briefing about how the district court could have more reasonably related… I know you don't want to break it down by phases, but it might be easier if we did. Let's say we say on the first motion for preliminary injunction, as the chief just pointed out, you did win on one claim but not on others, but you got—let's say we say that's a win, but should it be a full win or a partial win based on the fact that at least four claims, I think, or at least three of the claims were dismissed? So we provided a chart of our claims in our reply brief at docket number 36. All right. I know. The notice and comment claim you lost, worker survey claim you lost, sample size claim you lost. You only succeeded on hourly guarantee claim. So do we give you 100 percent for that or not? Because the overall result may have been the same even if you had prevailed on the other three. What's your thing? Help us think through, like, the first PI. So I'd like to—I can address how to think about how the district court could have looked at different stages of litigation, but I think that it's important to clarify some of the facts around how those claims were ultimately resolved. And so we, in fact, did not lose the—so even the notice and comment claim, claim number one in the chart, it was denied at the preliminary injunction stage, but claim number one is a related alternative legal theory to claim number two, upon which our clients prevailed. And under Hensley and Ibrahim, related alternative legal theories should not be counted as losses and used against—to deduct the fee award when the clients have prevailed on the related—have a related successful claim. But the district court abused its discretion by finding, you know, counting these as losses. What about the worker survey and the sample size claims? Are those related to the hourly guaranteed claim? So all of our claims are related. The district court correctly ruled that all of the claims are related. Let's say we—I appreciate the argument. Let's just say—assume for momentary purposes that they're not. How would that then be calculated? If you could help me, I just want to understand how you think that process would work. Oh, certainly, Your Honor. The case law is clear, Hensley and in this circuit's case law, that if there are unrelated claims that are unsuccessful, then the district court can deduct the fees for work done on those unrelated claims. However, if you have related claims and you have losses on some related claims, but they're related to your successful claims, then under Hensley and Ibrahim, the district court should not reduce the fee because the work done on those related unsuccessful claims still contributes to the benefit of the prevailing success on the related claims. Do you get any fees for the modification of the PI order? Is that new success or is that just, you know, the parties negotiated per Judge Mendoza's order and came out with parameters for the next survey? I mean, how do we look at that? Yeah, thank you for asking that question, Your Honor, because we should have received fees based on the successes in the modified first injunction order. That modified first injunction order memorializes several pieces of permanent policy relief that our clients obtained. And it also agrees to to reinstate higher market wages for for the 2022 harvest season. The district court in its fee order, it doesn't it references the modified first injunction in one sentence and a footnote that it happened. And the district court abused its discretion there because it should have looked at the relief that was obtained within that modified first injunction order. And under Hensley looked and added that to the scope of the overall relief to to find that our clients had obtained excellent results. But the district court ignored it. It was incorrectly focused on that litigation scorecard approach where it's just looking at the outcomes of motions, but not thinking about what was the actual relief that our clients were pursuing? What was their primary objective and was that obtained or not? So the two times that the Department of Labor issues new regulations or amends or revises its regulations during this pendency of this lawsuit, you think you should get credit for that? That's a win, right? Is there any evidence in the record that they would have made those changes? But for this lawsuit, so we wouldn't we wouldn't characterize them as wins, but we would say that for issues for related claims that become moot under Hensley and Ibrahim, work done towards those claims should not be counted against the fee award because Hensley says a court's failure of failure to reach certain grounds, which is mootness, should not is not a sufficient reason to reduce the fee. So then I still don't understand, how do you reduce your fee from. Or thirty seven thousand down to 250, if you're if you're telling the panel that all of these are successes, why are you saying cut it in half? So that those those were examples of if this court and district court were to find a limited success, then there is a way to look at the fee records to do the mandate under pageant to show your work when you're calculating the fees. And it could have done that easily by just looking at the dates in the fee records with the first injunction and the last injunction, and then taking the the the amounts related to those dates and awarding fees based on those as they are, as they are clear wins. And that would come out to about two hundred and fifty thousand dollars. Your honor, are you asking us to do the calculation or are you or are you asking us to tell the district court here are the mistakes you made in methodology? Here's how you should do it. Would you please do the calculation? So we are asking this court to reverse the district court's limited success ruling and find that our clients obtained excellent results and to remand to the district court for a substantial redetermination of the fee award. And that is in line with this court's en banc ruling in Ibrahim, where the district court, where this court reversed the district court on limited success, found that Ms. Ibrahim had achieved excellent results and then remanded for a substantial redetermination of the fee award. And as a reminder, under Hensley and Ibrahim, when the claims are related and excellent results have been achieved, then a full fee should be awarded. OK, you're out of time. Thank you. Thank you. Good morning, your honors, and may it please the court. John Drake on behalf of the United States Department of Labor defendants. My goal this morning is to bring some clarity to what actually happened in the district court. As you've seen in the briefing, this was an unusual case. The procedural history is long and complicated. It was essentially four years of amended complaints, emergency motions, interlocutory appeals and a motion to dismiss and a change of judges in midstream. Yes, your honor. That's right. And all of that was happening in the midst of five different prevailing wage surveys conducted by the state of Washington Employment Security Department, not by my client, the Department of Labor, and two substantive changes to DOL's prevailing wage regulations, as has been referenced. So this is all a bit difficult to grasp, even for the attorneys who lived through it. It's easy to get lost in the complexity, but we need to focus on this because understanding the procedural history is key to resolving the issues presented, particularly on the limited success issue. And I'll start by addressing. Talked about limited success at the outset in here. Do you agree? Because they're related, that the original claims were related to the ones that were, that didn't go forward in the first preliminary injunction, that this could be interpreted not as a limited success, but as an overall win? Well, I agree, your honor, that the claims are related, that that was not something that was disputed in the district court or in this court. The key question, though, is not whether the claims are related, but whether the degree of success achieved is warrants an award of full fees. And here the district court found that the extent of the plaintiff's success was very limited. So it sounds as though they did pretty well. They got you guys to withdraw regulations that they viewed as harmful. Are you saying there's no cause and effect between their lawsuit and withdrawing of those regulations? I do not agree that the Department of Labor changes regulations in response to anything the plaintiffs litigated in this case. Why did they change it then? With respect to the 2022 change, that was an omnibus overhaul of the prevailing wage regulations and a whole bunch of other regulations that pertain to this visa program. The piece that we're talking about is a very small piece, but this was not something that the department did in response to the litigation to try and moot the claim. And how do we know that? It does seem to me that there's at least a plausible cause and effect relationship. They asked for something. You ended up giving it to them, mooting out their claim. With respect to the 2022 final rule, Your Honor, that's the one that sort of changes from the outdated handbook 385 that was published in 1981 to the more modern, updated prevailing wage regulations. There is really no evidence in the record whatsoever that the department made that change in response to anything that the plaintiffs did. And I don't think the plaintiffs have ever made that argument. Why do you think they made the change then if it wasn't in response to the lawsuit? With respect to that first change, the 2022 change, this was a change that had been in the works for a very long time. And it's important to remember, of course, that we're talking about the administration of the prevailing wage system in the state of Washington. But but this is a nationwide program. And so to say that there was litigation pending in the eastern district of Washington that was affecting massive nationwide change for a very outdated system of regulations is is just a bridge too far. Now, I will say that with respect to the the change in 2023 on the A. We're only claim. Yes. I mean, that that was the exact issue that was. But isn't the core of the claim is to just get the peace rate prevailing wage in addition to ARA? And they got that. I mean, you know, we can kind of like try to slice and dice this baloney really, really thin. But the core of the claim is by making the change to the survey, you are having these harvesters paid minimum wage instead of peace rate wage, which is significantly higher. And they got that they got. You know, we can carve it up in different. You know, claims, but the core of what they asked for, they got repeatedly in this lawsuit. Well, respectfully, your honor, I disagree. They got that one time on the A. We're only claim at the end of the case with respect to the seven other claim. No, but let's look at Judge Mendoza's injunction. He says, hey, this is arbitrary and capricious. You need to go back and you need to figure out a survey that does not cheat these workers their fair pay. Right. So then they get the injunction and then he says, OK, parties, you go out and you negotiate what would be the survey parameters that would prevent this problem. And so then you have a modification of the injunction. I don't see why the plaintiffs don't get their attorneys fees for that negotiation. They were ordered to do that by the district judge to implement the preliminary injunction, the first plenary injunction. But you're saying, oh, no, that's not a success because that's not a new that's not a new success. That's just a repeat of the first preliminary injunction. But no, I don't think so. If you're extending that preliminary injunction to a next year survey and you are also creating the parameters for what type of employer survey would be acceptable. Under law, then they're actually implementing that first plenary injunction and to not even give them the fees for that doesn't seem right to me. Let me provide some additional context that might be helpful when we're talking about the initial injunction that was entered by Judge Mendoza in March of twenty twenty one and then the modified injunction. The parties use different terms. They call it the modified injunction. We call it the, you know, the essentially the modification or the change to that. What happened here is when the plaintiffs first filed the case and in their first preliminary injunction motion, they challenged the prevailing wage rates that have been derived from the twenty eighteen employer survey. And yes, as your honor mentioned, the district court found that that survey did not produce reliable data and that the survey instrument itself needed to be changed. And it went back to the prevailing wage rates for twenty eighteen. Now, the parties did negotiate a change to the survey instrument, which is a simple definition of what an hourly guarantee is and to exclude a prevailing minimum wage hourly guarantee from that definition. Now, when the survey results from twenty twenty came in, the parties looked at those and there were a lot of piece rate prevailing wage findings in that data set. And the plaintiffs looked at those prevailing wage rates and compared them to the twenty eighteen rates that the district court had gone back to and said, wow, we actually like those a lot better. And so what the parties ended up doing is modifying the injunction to essentially allow the Department of Labor to publish those rates in the ordinary course of its business to do exactly what it would have done in the absence of any preliminary injunction or any would that have happened without the lawsuit? It would have your honor. Exactly. And how would that have happened without the lawsuit? Had the lawsuit not been filed, the state of Washington would have conducted the survey, prepared the preliminary findings, submitted them to D.O.L. and D.O.L. would have evaluated them and said, yes, we're going to publish those rates. So for plaintiffs to say that we affected a change is really not true. I mean, they were essentially unwinding the injunction that they were given in March of twenty twenty one in order to get rates that they thought were more favorable to them. It's not something that would have happened. It is something that would have happened regardless of anything that happened in the litigation. I do want to address the plaintiff's claim that they protected millions of dollars. When the ESD updated the prevailing wage survey to add the hourly guarantee field, that was paying harvesters the hourly wage or A.W.R. instead of the piece rate. And it seems like and I agree with you, this is very complicated procedural history. It took up thirty two pages of your answer in brief, which to me, after I read thirty two pages of litigation, I thought and they only want to give them one hundred thousand dollars for doing thirty two pages of litigation. I mean, that seems a bit on the on the low end for that much litigation. Just my personal view after thirty two pages of litigation that you had to recover to to only give somebody one hundred thousand dollars for that for four years of litigation seemed on the low side. But that's neither here nor there. But all of these changes do seem to have more. Sort of locked in piece rate payment for these harvesters, and that seems to have been their ultimate goal. So I apologize. I think I'm repeating myself, but it does seem like, you know, we can sort of nitpick on all of this. But all of these changes seem consistent with that overall of getting harvesters closer to the piece rate prevailing wage than minimum wage. Thank you for the opportunity to address that. I think that really is where the rubber meets the road on this case, because plaintiffs are saying they achieved excellent results by protecting piece rate prevailing wage rates over the course of three years for all age to a farm workers. That is not the goal that they set out to achieve. If you look at the operative second amended complaint and the request for relief section specifically, it lays out APA claims that challenge the department's prevailing wage regulations and policies and seeks to set those policies and regulations aside as arbitrary and capricious and not in accordance with law. Permanent injunctive relief and declaratory relief is what the plaintiffs were seeking, not a modification of particular prevailing wage rates. For harvesters, that wasn't and that was a permanent injunction. Well, the permanent injunction was entered at the end of the case, and they were only claimed that did not have anything to do with the calculation of prevailing wage rates. That only has to do with offers that are made in the job order before the work is performed. And again, this gets very complicated, but in the end, it seems like they did lock in the piece rate prevailing wages. Do you agree with that? They did for one survey year in the state of Washington. It is true that the 2019 prevailing wage rates that they challenged, they did succeed in that challenge and reverted back to the 2018 rates. But from from that point forward, nothing that plaintiffs did in this litigation resulted in in their litigation causing any effect or any change to the prevailing wage rates. So you say the defendants out of the goodness of their own heart gave all of the other benefits unrelated to this lawsuit? No, Your Honor. I'm saying with respect to the 2020 rates that came in on the modified injunction order, this is something that this is just what the data showed. I mean, this is the survey that's conducted by the state of Washington Employment Security Department, and they're aggregating the data and they're running the calculations. And that is the data. And in that instance, the Department of Labor said, yes, we would like to publish those rates. And plaintiffs said, we agree those should be published in the ordinary course. With respect to the 2021 survey that plaintiffs unsuccessfully challenged in their second preliminary injunction motion, those prevailing wage rates were just never published. And it was not because of anything that plaintiffs did in this litigation. It was because the department had changed the calculation methodology, essentially, and the Department and the state of Washington Employment Security Department, not the Department of Labor. Those are the ones that were mooted. Is that correct? In the second preliminary injunction? I wouldn't say that they were mooted, Your Honor. I would say that the state decided that they wanted to just move forward and validate rates from the next year's survey. So it is not, again, anything being done by the Department of Labor that resulted in that and certainly not anything that the plaintiffs did. Let me ask you, just assuming it's not an overall excellent win and that is a limited success, you are arguing, it seems like, in your brief, that we shouldn't apply heightened scrutiny of the district court 75 percent cut. I think you basically assert that language comes from a dissenting or it seems like it's coming from a dissenting opinion. But that language comes directly from our opinion in Gates, right? So how can we affirm the district court's reasoning in this case when it is so similar to that given in Gates, which said that that is not enough of an explanation? Well, the Gates opinion, Your Honor, is talking very specifically about reduction in hours for time that is unproductively spent. So overbilling or duplicate of work, that's the final adjustment to the load star that heightens scrutiny language pertains to. I need to go through and trim the fat on this this attorney's bill. Right. It is not talking about the separate step of making this overarching, equitable, equitable determination about whether the plaintiffs achieved a degree of success that's commensurate with what they set out to achieve. Right. And so that heightened scrutiny standard really should not be applied in this context, because you have to remember when the claims are related, when they're intertwined, the district court is not supposed to go through the billing records. It's sort of an impossibility because you don't know where one claim begins and the next claim ends. Right. And so in that situation, when the claims are related, the district court has to make an equitable determination and a percentage reduction is the most logical way of doing it. Right. I mean, we can't look at the billing records. I mean, what other metric are you going to use? Right. put the district court behind the eight ball because it can't look at the billing records, but it has to make some sort of equitable adjustment. But then that equitable adjustment is going to be subjected to heightened scrutiny on an appellate review. It just it doesn't make any sense. Can I ask you a question? Is your position that all mooted claims don't count as successes or just in this case because the Department of Labor would have taken these actions on its own absent the litigation? The latter with one clarification. We're in the district court's opinion that the district court make that finding. I don't see anything in here where the district court actually evaluated whether the Department of Labor would have initiated the issuance of the new regulations or amending the regulations on its own absent the lawsuit. You're correct, Your Honor. The district court did not do that. And you're saying that is required, though, to make a decision as to whether a mooted claim should be compensable or not for fees. Respectfully. No, Your Honor. I'm not saying that. I think what I would like to convey is the district court did look at these mooted claims in the context of the case and the context in which they were litigated. And as was referenced earlier, there were four different claims pending at the preliminary, the first preliminary injunction stage, for example, the plaintiffs lost on three of those claims. Right. And two of those claims, the sample size threshold claim and the. And the wages and working conditions claim, if I recall, were essentially dismissed as a matter of law, the court ruled as a matter of law that these claims really are not viable. Right. And so that's a loss right out of the gate. Those claims were ultimately mooted. But the district court recognized that they were litigated and and were not successful. So it's possible that if you have a claim that is just sort of floating out there in a case and never gets litigated. And at the very end of the case, that claim became perhaps that claim should not be counted as a loss. But in the context of this case, the district court appropriately weighed the mooted claims as unsuccessful claims. Thank you. Thank you. You're out of time, but I'll give you one minute. Thank you, Your Honor. So our clients succeeded in what they set out to achieve. That's in our complaint at 6 ER 1393, where we stated that we were seeking to prevent action from, quote, drastically slashing the wages of Washington farm workers. End quote. And our clients succeeded in protecting those higher piece rate wages. And for the two other points, points that I have on rebuttal, Your Honor, we our clients obtained full relief in the first injunction. And even the department conceded at 2 ER 264 that the plaintiffs had, quote, achieved our primary objective, end quote. And so that constitutes excellent results. And lastly, we used our clients are requesting a full fee for the work done in support of those excellent results. We used the example of two hundred and fifty thousand dollars just as an example to show how the district court had been correct, incorrect and how it had no basis in the fee records. Thank you. Thank you very much. The case of Ramon Torres Hernandez versus Julia A. Sue, United States Secretary of Labor, is now submitted. Miss Warner, Mr. Drake, thank you very much for your oral argument presentations here today.
judges: MURGUIA, FLETCHER, KOH